***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding good cause to reconsider the evidence, the Full Commission AFFIRMS in part and REVERSES in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
The Industrial Commission has jurisdiction over the subject matter of this case.
The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
Hartford Specialty Risk Services was the carrier on the risk.
The employee-employer relationship existed between plaintiff and defendants at all relevant times.
Plaintiff sustained an admittedly compensable injury by accident to her left lower extremity on August 18, 1997.
Plaintiff's average weekly wage on August 18, 1997 was $300.00, which yields a compensation rate of $200.01 per week.
At the hearing before the Deputy Commissioner the parties stipulated into evidence plaintiff's medical records.
The parties offered the following exhibits at the hearing before the Deputy Commissioner which were admitted into evidence:
Care team coordinator job description (Plaintiff's Exhibit 1)
Plaintiff's administrative time sheets (Plaintiff's Exhibit 2)
Time sheet record codes (Plaintiff's Exhibit 3)
Plaintiff's Performance and Planning Appraisal dated 2/01/01 (Plaintiff's Exhibit 4)
Plaintiff's Response Contact Report dated 7/19/01 (Plaintiff's Exhibit 5)
Case Communication Form (Plaintiff's Exhibit 6)
Meeting Work Restrictions dated 8/07/01(Plaintiff's Exhibit 7)
Administrative time sheet ending 8/10/01 (Plaintiff's Exhibit 8)
July 5, 2000 letter from plaintiff's counsel (Plaintiff's Exhibit 9)
July 31, 2001 letter from plaintiff's counsel (Plaintiff's Exhibit 10)
Corrective Counseling dated 4/18/01 (Defendants' Exhibit 1)
Corrective Counseling dated 7/20/01 (Defendants' Exhibit 2)
Employee Contact Sheet dated August 9, 2001 (Defendants' Exhibit 3)
The issues for determination by the Commission are:
Was plaintiff's termination a constructive refusal of suitable employment?
Is plaintiff able to find suitable employment with another employer at the wage she made on August 18, 1997?
Is plaintiff entitled to continuing disability compensation?
Is plaintiff entitled to continuing medical benefits related to her compensable injury by accident?
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
At the time of the hearing before the Deputy Commissioner, plaintiff was a sixty-seven year old female, who obtained her G.E.D. from Central Piedmont Community College in 1996. Prior to beginning her employment with defendants, plaintiff was a homemaker, a waitress, and a census worker in Mecklenburg County.
In 1996, plaintiff became a certified nursing assistant (CNA). She began working for defendants shortly thereafter and her duties included assisting patients with activities of daily living such as bathing, grooming and dressing. Plaintiff was also responsible for grocery shopping, house cleaning, changing bed linens and washing laundry. She also checked blood pressure readings if the care plan so ordered.
Defendant Olsten Health Services is doing business as Gentiva Health Services. Plaintiff was employed by Gentiva Health Services.
Plaintiff injured her left knee in an injury by accident on August 18, 1997 in the course and scope of her employment with defendants. She reported the injury to her supervisor and sought treatment at the emergency room at Presbyterian Hospital. Defendants accepted the injury as compensable by filing a Form 60 on September 4, 1997.
Dr. Roy Majors of Charlotte Orthopaedic Specialists diagnosed plaintiff on September 16, 1997 with a medial meniscal tear, grade III chondral lesion of the medial femoral condyle, grade III chondral lesion of the femoral trachlea, diffuse osteophytes medial femoral condyle, grade III lesion of the lateral tibial plateau and major synovitis. Dr. Majors performed a partial meniscectomy and chondroplasty at the medial femoral condyle, femoral trachlea and lateral tibial plateau with major synovectomy and excision of osteophytes.
On October 6, 1997, Dr. Majors released plaintiff to return to work with a five pound lifting restriction; no repetitive bending, crawling, squatting, pushing or pulling; and only sit-down work. Defendants provided office filing duties which were suitable to plaintiff's restrictions. Plaintiff could no longer work as a CNA due to her restrictions.
By December 17, 1997, plaintiff reached maximum medical improvement, retaining a five percent permanent partial impairment to her lower left leg. She was also given permanent restrictions from Dr. Majors of no deep bending, stooping or squatting.
In early 1998, plaintiff applied for and was promoted to the client care coordinator job. Duties included receiving new patient files, assigning CNAs to patients, auditing charts, and red-lining the files for payroll. Plaintiff sat at a desk, and files were brought to her.
Dr. Majors referred plaintiff to Dr. Thomas McCoy, and on January 6, 1998, Dr. McCoy approved plaintiff to work on a light duty basis, with no lifting over twenty pounds. On February 24, 1998, Dr. McCoy indicated plaintiff might require a total knee replacement in the future.
Plaintiff continued to perform the client care coordinator job, which was suitable to her restrictions.
In May 1999, plaintiff's supervisor resigned and plaintiff's duties increased when her supervisor's work was distributed among the client care coordinators. At this time, plaintiff became responsible for retrieving her own files and some of her duties changed. Her new duties required walking a distance of ten feet to the records room to retrieve eight to ten charts per day. These duties were suitable to plaintiff's restrictions. Defendants also provided a rolling file cart.
On July 20, 1999, Dr. McCoy recommended plaintiff undergo a total left knee replacement. He increased her work restrictions to no lifting over five pounds, no prolonged bending, stooping, squatting, kneeling or crawling. The client team coordinator job was suitable to plaintiff's restrictions.
Plaintiff sought treatment with Dr. McCoy on September 1, 1999 because her pain in her knee was increasing. Dr. McCoy felt the knee was increasingly symptomatic due to arthrosis. Dr. McCoy continued to discuss total knee replacement. He had previously discussed the option of having plaintiff fit for a cane.
Plaintiff has been unable to undergo the knee replacement surgery due to poorly controlled hypertension, which is not causally related to the admittedly compensable knee injury.
On or about April 12, 2000, defendants relocated their offices. Plaintiff began performing payroll functions as client team coordinator, in addition to answering the telephone, receiving new patient information, and scheduling the CNAs. Plaintiff did significant computer data entry. She also walked a distance of twenty-five feet to use the photocopying machine, where she spent approximately fifteen minutes per day making copies. Plaintiff performed these tasks at her own direction and convenience and was not required to carry all the files to be copied at one time. By plaintiff's estimation, ninety percent of her work was by telephone with clients.
In May of 2000, defendants created a record's clerk position to assist all team coordinators with assembling and retrieving files from the file room.
Plaintiff was seen by Dr. McCoy on November 11, 2000 and on that date plaintiff wanted to proceed with the knee replacement. Plaintiff stated that she was unable to sleep and had difficulty walking. Plaintiff had persistent pain, which Dr. McCoy stated he would expect from the advanced osteoarthritis in her left knee. The condition of her knee remained the same.
Plaintiff continued to perform the client team coordinator job, but with a great deal of pain. Dr. McCoy noted plaintiff had other factors, including financial need, which motivated her to continue working.
Plaintiff filed a Case Communication on January 11, 2001 with her supervisor, Julia Butterfield, alleging harrassment by Beverly Resila, Manager of Clinical Practice for Gentiva.
Plaintiff received her annual performance review on February 2, 2001 from Ms. Butterfield. The performance appraisal rated plaintiff as effective.
Plaintiff received a Corrective Counseling Record on April 18, 2001 from Ms. Butterfield, after plaintiff had a disagreement with Ms. Resila over the handling of a case. The form stated that plaintiff is "confusing supervision and direction with harassment." Further disciplinary measures could be taken, including termination. Plaintiff testified that she understood that she could be terminated for further acts of insubordination. Plaintiff's direct supervisor was changed to Ms. Resila effective on that day.
Plaintiff wrote a response on the Corrective Counseling Record stating that she disagreed with most of the basis of the counseling, and that she had on several occasions reported that Ms. Resila spoke to her in a demeaning way which had never stopped. Ms. Butterfield testified that plaintiff had communicated to her that Ms. Resila called her "stupid."
On or about June 21, 2001, Dr. McCoy imposed permanent restrictions due to a decline in plaintiff's knee condition of no standing more than five minutes, along with the prior restrictions of no lifting over five pounds, no prolonged bending, stooping, squatting, kneeling or crawling.
By July 17, 2001, Dr. McCoy found that since plaintiff was unable to undergo knee replacement surgery, she had reached maximum medical improvement and retained a forty percent permanent partial impairment as a result of the left leg injury.
On July 20, 2001, a Corrective Counseling Record was given to plaintiff for not faxing a document to a nurse as directed by Ms. Resila. Ms. Butterfield told plaintiff that any further disruption from her behavior would result in termination.
On July 5, 2001 and again on July 31, 2001 plaintiff's attorney sent a letter to defendant-employer indicating that plaintiff was required to exceed her restrictions in performing her job. Specifically, plaintiff's counsel stated that plaintiff was being required to file and lift files weighing between five and fifteen pounds and standing for considerable periods of time.
As the basis for his argument that plaintiff's job exceeded her restrictions, plaintiff's attorney referenced a code 625 which appears on plaintiff's timesheet and is designated for filing/copying clinical records. The code did not differentiate between activities that were performed sitting or standing, and the record shows considerable confusion about the activities the code encompassed.
On August 7, 2001 at 4:00 p.m., plaintiff met with Ms. Butterfield, Ms. Resila, and Gayle Beatty, area supervisor, in response to the July 31, 2001 letter from plaintiff's attorney. A memorandum was drafted and signed by those attending the meeting in which defendants stated that they would abide by the work restrictions, but that plaintiff was to notify defendants through her manager if she needed help. The memo further stated that plaintiff's time sheet would be reviewed daily and if specific codes were used, plaintiff was required to add a comment to explain how defendant-employer provided assistance to plaintiff. Plaintiff's daily timesheet had to be signed by her manager and herself each day. Defendants stated that if a code 625 were used, plaintiff must note on her timesheet whether she was sitting.
At 5:00 p.m., on August 7, 2001, plaintiff gave Ms. Resila her timesheet on which she noted fifteen minutes of code 625 at 9:00 a.m. When Ms. Resila told plaintiff she did not observe her standing during that time, plaintiff became very upset and directed profanity at her supervisor. The incident escalated into one which everyone in the office could hear. When the confrontation occurred, Ms. Butterfield attempted to call plaintiff into her office, but after plaintiff refused, Ms. Butterfield went to plaintiff's cubicle to defuse the situation.
On August 9, 2001, defendants terminated plaintiff for insubordination which occurred on August 7, 2001. Plaintiff's termination was due to plaintiff's misconduct for which any other non-injured employee would have been terminated and was unrelated to the compensable injury.
While the Full Commission finds plaintiff `s disagreement with Ms. Resila's comments about her timesheet may have been reasonable, plaintiff's reaction specifically in using profanity was not justified or acceptable professional behavior.
Plaintiff testified she looked for another position after she was terminated, but was unsuccessful in obtaining employment.
Defendants have not offered assistance to plaintiff in finding other employment or providing vocational rehabilitation.
At the time of plaintiff's termination, she was performing job duties outside her work restrictions. Therefore, the job was not suitable employment. The Full Commission finds defendants made accommodations for plaintiff after she was injured which allowed her to continue working and that when those accommodations were no longer made, plaintiff was not able to perform her job duties under her permanent work restrictions from Dr. McCoy.
The Full Commission finds that plaintiff has limited work experience, was 67 years old at the time of the hearing before the Deputy Commissioner and has a permanent functional impairment to her left knee and significant work restrictions related to her admittedly compensable injury which will make it difficult for her to obtain suitable employment. Therefore, after her termination, plaintiff continued to be disabled from any employment as the result of her admittedly compensable injury by accident on August 18, 1997.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
On August 18, 1997 plaintiff sustained an admittedly compensable injury by accident to her left leg. N.C. Gen. Stat. § 97-2(6).
Plaintiff's termination from employment with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination constitutes a constructive refusal to perform the work provided. Seagraves v. Austin Co. ofGreensboro, 123 N.C. App. 228, 472, S.E.2d 397 (1996).
Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that her inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. AustinCo. of Greensboro, supra.
In this case defendants made special accommodations which allowed plaintiff to continue to work within her restrictions. Once these accommodations were no longer made, plaintiff was unable to continue to meet the requirements of her position. Plaintiff's job duties at the time of her termination exceeded her permanent work restrictions and therefore the employment was no longer suitable. Plaintiff's wages at the time of her termination do not constitute evidence of her true wage earning capacity and do not reflect her ability to compete in the labor market.Bridwell v. Golden Corral Steak House, 149 N.C. App. 338, 561 S.E.2d 298
(2002).
The greater weight of the evidence shows that plaintiff is capable of some work but that it would be futile because of her age, limited work experience and education, and significant permanent functional impairment to her leg and permanent work restrictions to seek employment. Russellv. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). Defendants have not shown that suitable jobs are available and that plaintiff is capable of obtaining suitable employment given her physical and vocational limitations. Kennedy v. Duke Univ. Med. Center,101 N.C. App. 24, 398 S.E.2d 677 (1990). Therefore, plaintiff is disabled and entitled to continuing total disability until further order of the Commission. N.C. Gen. Stat. § 97-29.
As the result of the compensable injury by accident, plaintiff retains a forty percent permanent functional impairment to her left leg. N.C. Gen. Stat. § 97-31(15).
As a result of the compensable injury by accident, plaintiff is entitled to have defendants pay for all medical treatment which tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, -25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
Defendants shall pay plaintiff continuing total disability at the rate of $200.01 per week from August 9, 2001 and continuing until further order of the Commission. The amounts which have accrued shall be paid in a lump sum subject to the attorney's fee approved below.
Defendants shall pay for medical treatment related to the compensable injury by accident which tends to effect a cure, give relief or lessen plaintiff's period of disability. This treatment may include a total knee replacement.
An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which shall be deducted and paid directly to plaintiff's counsel.
Defendants shall pay the costs.
This the ___ day of July 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/kjd